# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| VWS Holdco, Inc., *et al.,* | Case No. 25-10979 (    ) |
| Debtors.[1] | Joint Administration Requested |

## DECLARATION OF STEVEN F. AGRAN IN SUPPORT OF FIRST DAY RELIEF

I, Steven F. Agran, hereby declare as follows:

1. I am the chief restructuring officer ("CRO") of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "VWS").

2. I was retained by the Debtors as CRO on May 29, 2025.

3. I have over twenty-five years of experience providing turnaround, profit improvement, and interim management services to financially distressed companies.

4. As the Debtors' CRO, I am generally familiar with each of the Debtors' businesses, day-to-day operations, and financial affairs. Except as otherwise indicated, the statements set forth in this First Day Declaration are based upon my review of the Debtors' operations, information learned from my review of relevant documents, information supplied to me from the Debtors' advisors, or my own opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition. I am authorized to

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are as follows VWS Holdco, Inc. (5412) and Shoosmith Bros., Inc. (6914). The Debtors' mailing address is P.O. Box 2770, Chesterfield, VA 23832.

submit this declaration on behalf of the Debtors. If called to testify, I could and would testify competently to the matters set forth in this declaration.

5. On June 1, 2025 (the "Petition Date"), the Debtors filed voluntary petitions commencing these chapter 11 cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

6. The Debtors continue to operate their businesses and manage their affairs in the ordinary course of business as debtors in possession. The Debtors have filed various motions identified herein requesting "first day" relief. I submit this declaration in support of such first day relief, as well as to provide support for, and background concerning, the Chapter 11 Cases and other pleadings filed or expected to be filed in these cases.

## I. OVERVIEW OF THE DEBTORS' BUSINESSES AND FINANCIAL AFFAIRS

### A. The Debtors' Businesses

#### 1. The Landfill Operations

7. The Debtors own and operate the Shoosmith Landfill (the "Landfill") which has been in operation since 1976 and is located in Chester, Chesterfield County, Virginia approximately ten (10) miles south of Richmond, Virginia.

8. The Landfill has been owned and operated by present ownership since June 2008.

9. The Landfill is owned and operated by Debtor Shoosmith Bros., Inc. ("Shoosmith"), a Virginia corporation.

**B.      Capital Structure**

10. The Debtors have two corporate officers. Fred G. Nichols ("Mr. Nichols") is the president of the Debtors and Paul Lawrence McGee ("Mr. McGee") is the vice president of the Debtors.

11. Shoosmith is 100% owned by Debtor VWS Holdco, Inc. ("VWS Holdco").

12. VWS Holdco is a Delaware corporation that is 100% owned by non-debtor VWS Acquisitions, LLC ("VWS Acquisitions"), a Delaware LLC.

13. VWS Acquisitions has two different corporate owners with an ownership structure as follows: Environmental Services Management of Virginia, LLC ("ESM Virginia") owns 55.64% of the common membership units and 68.14% of the voting membership units of VWS Acquisitions; Volunteer Enterprises, LLC ("Volunteer")[2] owns 41.36% of the common membership units and 28.19% of the voting units of VWS Acquisitions; and Larry McGee, individually, owns 3% of the common membership units and 3.67% of the voting membership units of VWS Acquisitions.

14. ESM Virginia is 100% owned by ESM Management Group, LLC ("ESM Management"). ESM Management's membership units are owned as follows: 5.32% by the Estate of JF Kelly, 5.32% by John Collins, 5.32% by Marilyn Orcutt, 5.32% by Kent Durham, 42.55% by Larry McGee, and 36.17% by Mr. Nichols.

15. The membership units of Volunteer are owned 50/50 between Mr. Nichols and Mr. McGee.

16. Effective as of April 30, 2020, VWS, as borrower (in such capacity, the "SPA Borrower"), entered into that certain Amended and Restated Securities Purchase

---

[2] Volunteer is the proposed DIP Lender for the Debtors in these cases.

Agreement (as amended, modified, or supplemented from time to time, the "SPA") with VWS Acquisitions and the investors party thereto from time to time (in such capacity, collectively, the "Investors").

17. Pursuant to the SPA, the SPA Borrower issued Senior Notes and Junior Notes (each as defined in the SPA, and collectively, the "Notes" and the obligations thereunder and under the related Transaction Documents (as defined in the SPA), the "Note Obligations") in the original principal amounts of $35,777,223.52 and $64,942,214.21, respectively. The Notes are secured by the collateral (the "Notes Collateral") described in Section 2.1 of that certain Security Agreement dated June 27, 2008 (the "Notes Security Agreement")[3] between the SPA Borrower and the Notes Collateral Agent (as defined in the Notes Security Agreement).

18. On April 30, 2020, the SPA Borrower entered into that certain Amended and Restated Subordination and Intercreditor Agreement with Comerica Bank (in such capacity, the "Senior Agent") and the Investors (as may be amended, modified, or supplemented from time to time, the "Senior Intercreditor Agreement") with respect to the Note Obligations and the Security Documents (each as defined in the SPA).

19. Pursuant to that certain Non-Recourse Securities Assignment Agreement, effective as of January 27, 2023, Volunteer purchased and received all right, title, and interest in the Notes, the related Note Obligations, and all rights and obligations under the applicable transaction documents related thereto (the "Note Purchase"). From and after the closing of the Note Purchase, Volunteer became the Notes Collateral Agent and an Investor under the SPA.

20. As of the Petition Date, approximately $24,677,963.78 in Senior Note Obligations and approximately $158,372,630.41 in Junior Note Obligations remain outstanding

---

[3] The Notes Security Agreement was executed in connection with the original SPA.

(collectively, the "Prepetition Notes Obligations"), which obligations are secured by first-priority and second-priority liens (the "Senior Notes Liens" and "Junior Notes Liens," respectively) on the Notes Collateral (collectively, the "Prepetition Notes Liens").

21.     On May 27, 2025, the SPA Borrower, VWS Acquisitions, and the Investors entered into a third amendment to the SPA, which created a new class of notes (*i.e.*, the Bridge Notes) to provide funding for the Debtors to prepare for and commence these Chapter 11 Cases, on the condition that the SPA Borrower and VWS Acquisitions file necessary and appropriate pleadings with the Court seeking that the Court approve the "roll up" of the Bridge Notes Obligations in connection with the DIP Facility. As of the Petition Date, approximately $500,000 in obligations of the SPA Borrower under the Bridge Notes, the Security Documents, and, to the extent that they relate to or arise out of the Bridge Notes, the other Transaction Documents (the "Bridge Notes Obligations") remain outstanding, which obligations are secured by senior liens on the Prepetition Notes Collateral (the "Bridge Notes Liens"). The Bridge Notes Liens rank *pari passu* with the Senior Notes Liens.

## II.     Events Leading to Chapter 11 Bankruptcy Case

### 1.     Landfill Operations and Closure

22.     The Landfill when operating designated 506 acres as the waste utilization area or Waste Management Unit Boundary ("WMUB") based on the permit that was issued by the Virginia Department of Environmental Quality ("VDEQ"), which included a landfill footprint of 374 acres within the WMUB.

23.     The Landfill site included a rock quarry operated by Vulcan Materials that was scheduled to be converted to airspace of approximately 30 million tons for the disposal of municipal solid waste (MSW).

24. In February 2016, the VDEQ issued a permit for such use. Chesterfield County Virginia, the host county for the Landfill, challenged the permit and ultimately was successful in denying the continuation of the Landfill.

25. Certain property transfers in 2024 reduced the Landfill to 335 acres, with 261 acres in the WMUB; thus, reducing the permitted design capacity from 75.89 million cubic yards to 42.1 million cubic yards.

26. Based on the permits it had, the Landfill when operational allowed for disposal of an average daily volume of 2,562 tons of municipal solid waste based on 365 days per year (or 3,270 tons per day based on 286 actual operating days per year) with a maximum daily volume of 5,350 tons. The actual daily volume was approximately 2,500 tons, five days a week.

27. The Landfill accepted municipal solid waste, construction demolition debris, and industrial waste with conditional use permits for waste disposal from sources within the State of Virginia and District of Columbia.

28. The Landfill continued to operate until it was closed on December 30, 2022 and ceased accepting waste on that date resulting in minimal revenue thereafter.

29. This resulted in the Debtors downsizing their staff and bringing in consultants to assist with compliance in closing the Landfill, which included planning for the closure and implementation of such closure.

30. In connection with the closure of the Landfill, VDEQ required the Debtors to obtain (1) a closure bond in the present amount of approximately $6.6 million, to guarantee that the Debtors closed the Landfill in accordance with the rules, regulations, and specifications of its closure plan (the "Closure Bond"), and (2) a post-closure bond in the present amount of approximately $12.7 million, to guarantee that the Debtors properly monitors and maintains the

closed Landfill (the "Post-Closure Bond," and together with the Closure Bond, the "Surety Bonds").

31. Evergreen National Indemnity Company ("Evergreen") issued the Surety Bonds on behalf of the Debtors. To secure the Debtors' obligations related to the Surety Bonds, Evergreen holds cash collateral of the Debtors (i) in the present amount of approximately $2 million related to the Closure Bond, and (ii) in the present amount of approximately $12.7 million related to the Post-Closure Bond.

2. **Agreement with Swift Creek Renewables, LLC and Resulting Environmental Issues**

32. The Landfill produces methane gas and other gases. Federal regulations require landfills to capture or flare any fugitive gases to prevent their escape into the atmosphere.

33. In April 2020, Shoosmith entered into a contract with Morrow Energy using their subsidiary Swift Creek Renewables ("SCR") to capture the methane gas from the Landfill, treat it accordingly, and sell the gas through a network of natural gas pipelines.

34. This gas is afforded special treatment by the Federal Government due to its cellulosic renewable energy value. To allow SCR to use the gas, Shoosmith entered into purchase agreement for such gas rights with Ingenco (now owned by Archaea Energy, a BP Company, which previously had such gas rights) for $6.75 million dollars. These agreements required sixty-four equal monthly payments of $126,682.20 due 45 days following the month end of the first month the gas was transferred to SCR. The gas transfer occurred on September 13, 2023 with the first note payment due on August 15, 2023.

35. The transaction with SCR provided for a 25% royalty on gas provided to Shoosmith. These royalties were projected by SCR to exceed $1.0 million per month at levels of gas production projected by SCR. SCR estimated that the construction of a related necessary gas

plant on Shoosmith's property would cost approximately $40.0 million. A requirement of the contract with SCR called for a 50% reduction in the 25% royalty until SCR had been compensated for certain "Reimbursable Costs" ("RC") outlined in the contract. These RC's were estimated to not to exceed $8.0 million. Today, RC's total over $42.0 million, and the May royalty paid to Shoosmith for February 2025 gas produced was a mere $44,379. The royalty for March 2025 payable in June is estimated to be $13,920.

36. On June 20, 2024, Shoosmith received a letter from the VDEQ asserting that the VDEQ had reason to believe that the Landfill may be in violation of Air Pollution Control Law and Regulations (the "Violation").

37. The Violation was related to high temperature wells, destruction of the integrity of the synthetic closing cap installed over the landfill, and increase of leachate generation exceeding all estimates referenced by the VDEQ's environmental engineers.

38. With regards to the Violation, Shoosmith asserts that SCR caused the violation, specifically in the way that SCR drilled the liner of the Landfill in their efforts to capture the methane gas.

### 3. Increase in Costs to Remove Effluent Leachate

39. Effluent leachate is a toxic and contaminated liquid that is generated from municipal landfills.

40. As the operator of the Landfill, Shoosmith undertakes the removal of effluent leachate to comply with applicable environmental regulations.

41. Until July 3, 2024, Shoosmith held a contract with Chesterfield County to accept the effluent leachate from the Landfill in their Public Owned Treatment Works at a rate of $.02 per gallon. The waste was required to meet certain requirements in order to be accepted. Unbeknownst to the Debtors, upon information and belief, a former employee falsified the

quantity and analysis of the effluent leachate resulting in a suspension of the contract with Chesterfield County for effluent leachate removal. Instead of paying $30,000 to $50,000 per month to treat the effluent leachate, the Debtors are now required to use alternate service providers charging the Debtors $.15 per gallon for treatment, plus related transportation costs of $.07 per gallon. This total of $.22 per gallon has resulted in an eleven-time cost increase that is unstainable for the Debtors' business operations considering that they now have relatively no income.

42. The massive increase in costs for the removal and treatment of the effluent leachate without a corresponding increase in revenue has left the Debtors in an impossible financial position and necessitated this bankruptcy filing.

### 4. Ongoing Litigation

43. Certain minority members of ESM Management have an ongoing litigation in the 352nd Judicial District of Texas located in Tarrant County individually and derivatively on behalf of ESM Shoosmith, VWS Holdco, and VWS Acquisitions, LLC against Mr. Nichols and Mr. McGee alleging certain breaches of fiduciary duty and agreements with respect to the management of such entities amongst other related causes of action (the "Minority Members Litigation"). The Minority Members Litigation is heavily disputed and is still pending adjudication.

### 5. Appointment of CRO

44. On or about May 28, 2025, I was appointed by the Debtors to act as their Chief Restructuring Officer in preparation for, and during, these Chapter 11 Cases.

45. I immediately began to review the Debtors' business operations, challenges and documentation, in an effort to analyze the Debtors' situation and assist the Debtors and their professionals in charting the best course forward in these cases.

46. I have held extensive conversations with the company's Financial Advisor and ownership in developing the DIP Budget and additionally assisting the company's Investment Banker in better understanding the monthly cash flow from Morrow and the changes that have occurred regarding methane production

47. I have worked with identifying claim agents, reviewed motions, and reviewed the DIP Financing Agreement. I have discussed the necessity of filing the case with ownership and determined the necessity of the DIP funding and reasonableness of the proposed rates and fees.

### 6. Debtors' Goals for the Bankruptcy Proceeding

48. The Debtors' financial position puts the Debtors in a precarious position in that they cannot continue to sustain operations given their operating costs in comparison with the revenue that the Debtors currently generate. The effluent leachate being generated in the Landfill must continue to be removed and treated in order to avoid environmental impact on the surrounding area and the Debtors have insufficient liquidity to continue that process much longer.

49. To that end, the Debtors intend to use the Chapter 11 process to address the issues posed with (a) the terms of the SCR contract and (b) the environmental considerations and leachate removal. Concurrently, the Debtors intend to initiate a sale process through these Chapter 11 Cases, in an effort to maximize the value of the Debtors' assets while providing for the continued operation and closure of the Landfill through a new party to replace the Debtors as the owner and operator of the Landfill.

### III. FIRST DAY MOTIONS

50. Substantially contemporaneous with the filing of their chapter 11 petitions, the Debtors have filed or intend to file a number of motions identified herein requesting "first

day" relief (the "First Day Motions") that the Debtors believe are necessary to enable them to maximize the value of their estates while the Chapter 11 Cases are pending.

51. In addition, the Debtors are actively negotiating with certain insiders and prepetition lenders of the Debtors to finalize the terms of debtor-in-possession financing to fund the case in the short term and to fund a sale process of substantially all of the Debtors' assets. As an additional First Day Motion, a motion to approve such debtor-in-possession financing is expected to be filed prior to the hearing to consider the First Day Motions.

52. The facts set forth in the First Day Motions are incorporated herein in their entirety. The Debtors request that the Court grant the First Day Motions as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during, the pendency of these Chapter 11 Cases.

53. I have reviewed each of the First Day Motions, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief with appropriate reliance on the Debtors' personnel and advisors. To this end, the Debtors have filed, or soon will file, the following First Day Motions:

　　i.　*Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases;*

　　ii.　*Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to Redact Certain Personal Information;*

　　iii.　*Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use their Cash Management System and (B) Continue to Use Existing Payment Methods, (II) Authorizing the Debtors to Maintain and Continue to Use Existing Business Forms without Reference to its Status as Debtors in Possession; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief;*

　　iv.　*Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages, Benefits and Other Compensation Obligations, (II) Authorizing Financial Institutions to Honor All Obligations Related thereto, and (III) Granting Related Relief;*

     *v.*    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue (A) to Maintain Prepetition Insurance Policies, (B) to Maintain Prepetition Surety Bonds, and (C) to Use the Services of Brokers; and (II) Granting Related Relief;*

    *vi.*    *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers, and Authorizing Debtors to Provide Additional Assurance, (III) Establishing Procedures to Resolve Requests for Additional Assurance and (IV) Granting Related Relief;*

   *vii.*    *Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Certain Taxes;*

  *viii.*    *Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and (II) Granting Related Relief;*

    *ix.*    *Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs; and*

    *x.*    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Use Cash Collateral, (B) Obtain Senior Secured Superpriority Postpetition Financing and Grant Liens and Superpriority Administrative Claims, and (C) Provide Adequate Protection, (II) Scheduling a Final Hearing, and (III) Granting Related Relief* [To Be Filed].

    54.    It is my belief that the relief sought in each of the First Day Motions is necessary for the Debtors to continue operations, avoid environmental harm, while seeking to maximize value for creditors. It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, *i.e.* the First Day Motions seeking relief related to the Debtors' obligations to their insurers, taxing authorities, critical vendors and banks, the relief requested is essential to avoid immediate and irreparable harm to the Debtors' estates. The success of these Chapter 11 Cases depends upon the Debtors' ability to maintain their operations, maximize estate value, and successfully confirm a plan of reorganization. The relief requested in the First Day Motions is a

critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful chapter 11 process.

## CONCLUSION

55. I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other further relief as may be just.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June 1, 2025
      New York, New York                           /s/ Steven F. Agran
                                                     Steven F. Agran